UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
COMPAGNIE NOGA D'IMPORTATION ET          :
D'EXPORTATION S.A.,                      :
                                         :
                    Plaintiff,           :     00 Civ. 0632 (WHP)
                                         :
        -against-                        :     MEMORANDUM AND ORDER
                                         :
THE RUSSIAN FEDERATION,                  :
                                         :
                    Defendant.           :
                                         :
----------------------------------------X

WILLIAM H. PAULEY III, District Judge:

Plaintiff Compagnie Noga d'Importation et d'Exportation S.A. ("Noga") moves to confirm and enforce arbitration awards (the "Award") issued by the Arbitration Institute of the Chamber of Commerce of Stockholm, Sweden (the "Stockholm Panel") against the Russian Federation ("Defendant"). For the following reasons, Noga's motion to confirm and enforce the Award is denied.

BACKGROUND

I. Procedural History

Noga commenced this action on January 28, 2000 to confirm the Award, domesticate certain Swedish court judgments, and enforce each against Defendant. By Memorandum and Order dated September 19, 2002, this Court granted Noga's motion to domesticate the Swedish judgments and granted Defendant's request to apply a set-off to those judgments. Companie Noga D'Importation et D'Exportation S.A. v. The Russian Federation,

No. 00 Civ. 0632 (WHP), 2002 WL 31106345, at *9-11 (S.D.N.Y. Sept. 19, 2002). However, this Court declined to enforce the Award against the Russian Federation on the ground that it was a different entity from the Russian government, the respondent in the underlying Swedish arbitration. Noga, 2002 WL 31106345, at *8. The Court of Appeals vacated that aspect of the Memorandum and Order and determined that, under the Russian Constitution, the government—consisting of the Chairman of the Government, the Deputy Chairman and the federal ministers—"is not a sovereign, corporation or instrumentality separate from the Russian Federation." Companie Noga D'Importation et D'Exportation S.A. v. The Russian Federation, 361 F.3d 676, 685 (2d Cir. 2004). The Court of Appeals remanded the action "for further development of the record" with the instruction that this Court consider "(i) whether Noga's assignments of its arbitration proceeds to certain of its creditors deprived it of standing to seek confirmation of the arbitral award; and (ii) whether the creditors to whom Noga assigned the arbitration proceeds must be joined as necessary and indispensable parties under Fed. R. Civ. P. 19." Noga, 361 F.3d at 678, 690.[1]

II. Factual Background

The facts underlying this action are more fully set forth in this Court's September 19, 2002 Memorandum and Order and the Court of Appeals' Opinion. Noga, 2002 WL 31106345; Noga, 361 F.3d 676. The following facts are relevant to this motion.

---

[1] Noga's conduct following remand substantially delayed the proceedings and needlessly burdened the Court. For example, Noga repeatedly failed to comply with this Court's orders—twice resulting in sanctions, once for the failure to produce a witness in London and then again for failure to submit timely expert reports. To date, Noga has not satisfied its obligations under the second sanctions order. Noga also played fast and loose by substituting counsel, precipitating withdrawal motions by substituted counsel, and finally reconciling with its attorneys, only to later initiate ex parte communications directly with this Court (Docket No. 191).

A. Loan Agreements

Noga is a Swiss corporation engaged in international trading of goods and services. In 1991 and 1992, Noga extended credits and loans of approximately $1.4 billion to the government of the Federative Socialist Soviet Republic of Russia ("RSFSR") for the purchase of various goods (the "Loan Agreements"). The RSFSR was to repay Noga through shipments of crude oil on pre-arranged schedules. After the Russian Federation—the RSFSR's successor— allegedly failed to make oil shipments, Noga declared a default under the Loan Agreements and eventually pursued arbitration with the Stockholm Panel.

B. Assignments by Noga

In 1993 and 1994, Noga assigned portions of the proceeds (the "Assignments") of its receivables from the Russian Government to Banque Nationale de Paris (Suisse) S.A. – Basle ("BNP"), Crédit Lyonnais (Suisse) S.A. ("Crédit Lyonnais"), United Overseas Bank, and La Caisse d'Epargne de la République et Canton de Genève ("CEG Genéve"), the primary lenders financing the Loan Agreements (collectively, the "Assignee Banks"). The assignment contracts provided that Noga would pursue collection of the receivables. (Declaration of Howard S. Zelbo dated Feb. 20, 2007 ("Zelbo Decl.") Exs. II: Assignment to CEG Genéve dated Aug. 11, 1993; JJ: Assignment to Crédit Lyonnais dated Dec. 24, 1993; KK: Assignment to United Overseas Bank dated June 2, 1994; & LL: Assignment to BNP dated Aug. 24, 1994.)

C. Arbitration Award

In 1997, after the liability phase of the arbitration, the Stockholm Panel awarded Noga principal and management fees of $27,294,000 plus interest (the "Phase I Award"), and described the method for calculating the total amount due in light of the parties' respective

interest obligations. In 2001, the Stockholm arbitrators awarded Noga an additional $25,348,865 in consequential damages (the "Phase II Award"). On appeal, the Phase II Award was reduced to approximately $7,000,000. (Zelbo Decl. Ex. CC: <u>Gov't of the Russian Federation v. Companie NOGA d'Importation et d'Exportation SA</u>, Judgement of Stockholm District Court dated Jan. 18, 2005.) Defendant calculates the total value of the Phase I and Phase II Awards (the "Award") with interest as of January 18, 2005 to be $88,904,744. (Zelbo Decl. Exs. AA & FF: Spreadsheets of Phase I and Phase II Award Values.)

### D. <u>Noga's Bankruptcy</u>

After the Assignments, Noga initiated bankruptcy proceedings in Switzerland. In a February 14, 1996 order addressing Noga's declaration of bankruptcy, the Swiss court noted that the Assignee Banks "have agreed to finance the professional fees and the costs of the arbitration proceeding [against the Russian Federation]" and that these advances are considered "mass debts of bankruptcy." (Zelbo Decl. Ex. OO: Judgment of the Court of First Instance, No. 2782/96 dated Feb. 14, 1996 at 3.) The Assignee Banks advanced $2,751,219 (the "Advance") to Noga to pursue arbitration. (Zelbo Decl. ¶ 36.)

On December 18, 1998, the Swiss court approved a restructuring of the debt between Noga and its creditors (the "Concordat"). The Concordat provides that "Noga will, in its own name, take all steps, both for itself and for [the creditors'] account, with a view to obtain [payment on the Russian claims]," but reserves to the Assignee Banks "their right to directly assert their assignment of claims." (Zelbo Decl. Ex. MM: Confirmation of the Composition Agreement dated Dec. 23, 2998 at 4.) The Concordat also contains a waterfall clause (the "Concordat Provision"):

> Every payment on the Russian claim will be used at the time of

-4-

> receipt in the following order: (i) full payment of the costs of the
> arbitration and/or collection of those defined in the judgment of the
> Court of first instance of February 14, 1996; (ii) payment of the
> claims of the creditors which are the assignees of the Russian
> claim according to the terms of their assignment agreements, and
> (iii) refund to Jean Rouch of the amounts given to Noga for
> payment of the expenses incurred during the moratorium . . .

(Zelbo Decl. Ex. MM at 4.) The Concordat further provides that "interest is not counted after July 23, 1997, except for obligations incurred during the moratorium, the claims secured by mortgage, and those of the first and second class." (Zelbo Decl. Ex. MM at 2.)

Noga's balance sheet as of December 31, 1999 quantifies the arbitration costs to be reimbursed out of any collection on the Award. (Zelbo Decl. Ex. I: Compagnie Noga Balance Sheet dated Dec. 31, 1999.) The amount reflects only the Advance and not any of Noga's own costs. (Zelbo Decl. Ex. I.) Moreover, Noga's representative testified that the "arbitration costs and/or collection . . . mentioned in the decision of the tribunal of first instance dated 14th February 1996" are in fact the amount of the Advance shown on Noga's balance sheet. (Zelbo Decl. Ex. G: Transcript of the Deposition of David N. Gaon dated Apr. 25, 2001 at 77:21-25; 78:1-11.)

A chart prepared by Noga shows that the value of the Advance and Assignments with interest as of December 31, 2003 was $94,433,698.[2] (Zelbo Decl. ¶¶ 47-48 & Ex. TT: Montreux Agreement dated June 1, 2004, Annex 1.) On October 27, 2005, Noga confirmed that both the Advance and the Assignments were interest-bearing. (Zelbo Decl. Ex. VV: Letters from Noga to Credit Lyonnais' assignees dated Oct. 27, 2005.)

---

[2]This figure is based on then-prevailing exchange rates between the Swiss Franc (CHD) and the United States Dollar (USD).

### E. Further Assignments

After the remand to this Court, the Assignee Banks sold their interests in the Award as well as any rights created by the first clause of the Concordat Provision (i.e., full payment of the costs of arbitration as defined in the judgment of the Court of first instance of February 14, 1996) to IPD Capital Inc. ("IPD"). (Declaration of Alex Kogan dated Feb. 13, 2007 ("Kogan Decl.") ¶ 2.) On February 15, 2006, IPD revoked Noga's collection mandate under the Concordat Provision. (Kogan Decl. ¶ 5 & Ex. H: Letter from Kogan to Noga dated Feb. 15, 2006.) Before purchasing the Assignments, IPD, together with Credit Lyonnais, approached the three independent commissioners responsible for supervising the implementation of the Concordat. (Zelbo Decl. Ex. WW: Letter from Daniel Tunik to Administrators of the Concordat of Compagnie Noga d'Importation et d'Exportations SA c/o Ronald Kaufmann dated Nov. 12, 2003.) The Commissioners confirmed that, inter alia, the assigned claims accrue interest and the first clause of the Concordat Provision covers only the Advance and not Noga's own costs. (Zelbo Decl. Ex. XX: Letter from Ronald Kaufmann to Daniel Tunik dated Dec. 4, 2003.)

IPD then sold its interest in the Award to Vnesheconombank ("VEB"), a Russian state-owned bank, which granted IPD a collection mandate to pursue the claims against the Russian Federation. (Kogan Decl. ¶ 7.) Neither IPD nor VEB ratified Noga's action before this Court. (Kogan Decl. ¶ 7 & Ex. K: Letter from Alexei Smirnov to Kogan dated Feb. 13, 2007.) By letter dated January 25, 2008, Defendant informed the Court that the Ministry of Finance of the Russian Federation purchased VEB's claims on December 29, 2007. Since the Russian Federation now owns the Assignee Banks' interest in the Award, the indispensability question

posed by the Second Circuit is moot.

DISCUSSION

I. Motion to Confirm

A motion to confirm an arbitration award rendered in a foreign state is governed by the framework set forth in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53 (the "Convention"), as implemented by, and reprinted in, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08. "'Under the Convention, [a] district court's role in reviewing a foreign arbitral award is strictly limited' and 'the showing required to avoid summary confirmance is high.'" Noga, 361 F.3d at 683 (quoting Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19, 23 (2d Cir. 1997)). "The public policy in favor of international arbitration is strong." Noga, 361 F.3d at 683 (quoting Fotochrome, Inc. v. Copal Co., 517 F.2d 512, 516 (2d Cir. 1975)). Upon the application of a party to an arbitration award, the FAA provides that a district court shall enter "an order confirming the award as against any other party to the arbitration," absent "one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207

Even in such circumstances, however, at an "irreducible . . . minimum," Article III of the Constitution requires a plaintiff to have "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 55, 560 (1992) (internal quotation marks and citations omitted).

A. Applicable Law

Whether a party has standing to sue in federal court is "a question of federal law." Baker v. Carr, 369 U.S. 186, 204 (1962); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985); Conn. v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 116-17 (2d Cir. 2002). However, where the terms of an agreement are relevant to determining whether a party has an interest in a litigation, the court will look to the substantive law governing the agreement to interpret its meaning and effect. Brocklesby Transp., A Div. of Kingsway Transps., Ltd. v. E. States Escort Servs., 904 F.3d 131, 133 (2d Cir. 1990). Thus, this Court applies Swiss law to interpret the Concordat and federal law in analyzing the Concordat's impact, if any, on Noga's standing.

Fed. R. Civ. P. 44.1 provides that, in interpreting foreign law, courts may "consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence." "Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of [an] independent examination of foreign legal authorities." Guidi v. Inter-Continental Hotels Corp., No. 95 Civ. 9006, 2003 WL 1907901, at *2 (S.D.N.Y. Apr. 16, 2003) (internal quotations marks and citations omitted). Courts weigh conflicting expert opinions on foreign law by the "persuasive force of the opinions they express[]." See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).

B. First Concordat Provision

According to Defendant's expert, under Swiss insolvency law, a regular composition agreement—i.e., a debt restructuring agreement—customarily includes provisions regarding "(1) to what extent the non-secured third class creditors are paid and to what extent

they waive their claims, (2) when and how the debtor fulfils his payment obligations, and (3) how the performance of the composition agreement is secured." (Zelbo Decl. Ex. N: Opinion on Swiss Law of Franco Lorandi dated April 11, 2006 at 5.) Courts interpret such agreements using "other rules of interpretation than those governing civil law agreements," focusing on objective elements such as the wording and the structure of the agreement as well as its history and how it came to its final form." (Zelbo Decl. Ex. N ¶¶ 6, 10.) Where, however, a composition agreement contains terms that go beyond what is required, such terms are treated as contractual terms and interpreted accordingly. (Zelbo Decl. Ex. N ¶ 12.)

While Defendant's expert characterizes the Concordat as a regular composition agreement (Zelbo Decl. Ex. N ¶¶ 6, 10), he asserts that certain of its provisions lie outside the customary parameters of such an agreement. Specifically, the Concordat Provision "governs the contractual relationship between Noga . . . and the [A]ssignee [B]anks . . . as well as the application of payments made on the Russian claim. (Zelbo Decl. Ex. N ¶ 12.) This "goes far beyond what is required by law and what is normally dealt with in a composition agreement," and thus should be interpreted as a contract. (Zelbo Decl. Ex. N ¶ 6, 12.)

Defendant's expert goes on to explain that the first inquiry under Swiss contract law is into the parties' subjective understanding of the contract terms. (Zelbo Decl. Ex. N ¶¶ 15-14.) Absent such a mutual understanding, an objective analysis should be applied; in this regard, the parties are "deemed to have agreed to what reasonable and honest parties under the given circumstances would have expressed." (Zelbo Decl. Ex. N ¶ 16.) The court should analyze the plain language of the agreement and its internal structure first, before turning to other circumstances, such as time, place, and the parties' respective interests. (Zelbo Decl. Ex. N ¶¶

20-21.) MasterCard Int'l Inc. v. Federation Internationale de Football Association, No. 06 Civ. 3036 (LAP), 2006 WL 353119, at *59-60 (S.D.N.Y. Dec. 7, 2006) (describing principles of Swiss contract interpretation).

Noga's expert[3] agrees with Defendant's explanation of concordats in Swiss law (Zelbo Decl. Ex. S: Expert Opinion of Pierre-Andre Oberson dated July 19, 2006 ¶ 1) and of the interpretation of civil contracts (Zelbo Decl. Ex. S ¶ 10), but counters that there is no reason to use contractual interpretation because the Concordat Provision does not reach subjects beyond the scope of a general composition agreement. (Zelbo Decl. Ex. S ¶¶ 7-8.)

Here, the senior debt pursuant to the Concordat Provision is the "full payment of the costs of the arbitration and/or collection of those defined in the judgment of the Court of first instance of February 14, 1996" (Zelbo Decl. Ex. MM at 4), which notes that the Assignee Banks "have agreed to finance the professional fees and the costs of the arbitration proceeding [against the Russian Federation]" and that these advances are considered "mass debts of bankruptcy" (Zelbo Decl. Ex. OO at 3). Thus, the plain language of these documents does not contemplate the senior debt including any recovery of Noga's own costs. This Court is not persuaded by Noga's argument that the phrase "full payment" includes all costs of the arbitration.

Defendant's interpretation is supported by Noga's own statements and balance sheet, which reflect only the Advance in the arbitration costs to be reimbursed out of any

---

[3] By Orders dated December 18, 2006 and January 9, 2007, this Court ordered Noga to tender $25,000 to the Clerk of Court representing the fees and costs incurred by Defendant to respond to Noga's late-filed sur-reply expert reports or face preclusion. The docket sheet in this action does not reflect any such payment. Accordingly, this Court declines to consider Noga's late-filed sur-replies or Defendant's response, but notes that their consideration would not alter the outcome here. As discussed earlier, Noga's delays during expert discovery are emblematic of its conduct—mystifying from a plaintiff—throughout this litigation, in which it has parried and stalled. Ironically, it is the Russian Federation that has pressed for closure.

collection on the Award. (Zelbo Decl. Exs. I & G at 77:21-25; 78:1-11.)

Finally, Defendant's interpretation is supported by independent Swiss Commissioners, who agree that the costs in the first clause of the waterfall refer only to the Advance and "not to expenses that Noga . . . may have incurred." (Zelbo Decl. Exs. WW & XX.) If Noga had a different understanding when it entered into the Concordat, the Commissioners would have been obliged to raise the discrepancy with the court. As the Commissioners raised no such issue, "[their] view that prong (i) does not cover Noga's own expenses in the arbitration is strong evidence that this was also Noga's own understanding when entering into the Concordat." (Zelbo Decl. Ex. N ¶ 43.)

Accordingly, Noga has no interest in the senior debt under the Concordat Provision.

C. Interest

A party that has assigned its entire interest in a claim lacks standing to bring suit on that claim. Macondo's Profit Corp. v. Motorola Comms. & Elecs., Inc., 863 F. Supp. 148, 149 (S.D.N.Y. 1994); Physicians Health Servs., 287 F.3d at 117 (Assignee "replaces the assignor with respect to the claim or the portion of the claim assigned, and thus stands in the assignor's stead with respect to both the injury and the remedy."). With interest, the amount owed under the first two clauses of the Concordat Provision would absorb the entire Award. Thus, the question is whether interest runs on the Assignments.

In a Swiss insolvency, interest on the claims of regular third class creditors ceases at a defined point in time. (Zelbo Decl. Exs. N ¶ 84 & S ¶ 32.) Here, Defendant's expert argues that the Assignee Banks were not ordinary third class creditors because they waived their right to

a dividend and agreed instead to recover only from collection on the Russian claim. (Zelbo Decl. Ex. N ¶¶ 85-87, 100-104.) Moreover, he adds, "[a]ny class of creditors which has not consented to a fixed percentage of a dividend, but shall be paid out of the debtor's proceeds, shall be entitled to receive interest on their claim before the debtor is allowed to keep such proceeds." (Zelbo Decl. Ex. N ¶ 90.) Additionally, the Assignments function like a mortgage and properly fall within the exception to the general rule that interest does not accrue on claims following a debtor's bankruptcy. (Zelbo Decl. Ex. N ¶¶ 79-82.) In a somewhat impenetrable discussion, Noga's expert counters that the Assignee Banks are normal third class creditors and that interest therefore does not run on their claims.

After considering both sides' reports, this Court credits Defendant's expert. See Curley, 153 F.3d 5, 12. Moreover, Noga's own documents undermine its expert's interpretation and support Defendant's expert's interpretation. A chart prepared by Noga shows the value of the Advance and Assignments with interest to be $94,433,698 as of December 31, 2003. (Zelbo Decl. ¶¶ 47-48 & Ex. TT: Montreux Agreement dated June 1, 2004, Annex 1.) On October 27, 2005, Noga noted that both the Advance and the Assignments were interest-bearing. (Zelbo Decl. Ex. VV.) In contrast, Noga's recordkeeping undermines its expert's interpretation. Finally, the Swiss Commissioners agree that the "assignment of claims as well as the Concordat do not limit the Assignee Banks' right to demand their claim and the interest accrued." (Zelbo Decl. Exs. WW & XX.)

Accordingly, this Court finds that interest runs on the Assignments, and that their value—by Noga's own admission $94,433,698 in 2003—exceeds the value of the Award. Thus, Noga has no interest in the Award, and no standing to pursue its claim in this Court.

II. Unjust Enrichment

Noga attempts to advance an unjust enrichment claim against Defendant following the Court of Appeals' remand. However, this claim does not appear in its original petition, which Noga never sought to amend. Accordingly, this Court declines to consider Noga's unjust enrichment claim.

III. Motion to Enforce Foreign Judgments

The Court of Appeals did not reverse the portion of this Court's September 19, 2002 Memorandum and Order domesticating certain foreign judgments and subjecting them to a set-off. Accordingly, that portion of the September 19, 2002 Order is incorporated by reference herein. See Noga, 2002 WL 31106345, at *9-11.

CONCLUSION

For the reasons stated above, Noga's motion to confirm and enforce the Arbitration Award against the Russian Federation (Docket No. 181) is denied. The Clerk of Court is directed to terminate all motions pending as of this date and close the case.

Dated: August 15, 2008
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to:*

James K. Hargrove, Esq.
Shelley G. Schwartz, Esq.
Richard K. Bernstein Associated, P.C.
509 Madison Avenue
Suite 1916
New York, NY 10022
*Counsel for Plaintiff*

Howard S. Zelbo, Esq.
Cleary, Gottlieb, Steen & Hamilton
Citicorp Building
153 E. 53rd Street
New York, NY 10022
*Counsel for Defendant*